# EXHIBIT A

consignee who refuses to accept damaged goods may be liable for demurrage.[5] The basis of this rule is that the consignee can more easily dispose of the damaged goods at a fair price.

## B. THE BILL OF LADING

### § 10–11. Bills of Lading: Applicable Laws, Functions, and Use

The traditional bill of lading is a document which is signed by the carrier or his agent acknowledging that goods have been shipped on board a specific vessel that is bound for a particular destination and stating the terms on which the goods are to be carried. In common carriage the shipper has a right to the issuance of a "shipped" bill of lading.[1] Each shipping line generally has its own form of bill of lading.

(D.Md.1979), affirmed 664 F.2d 904, 1981 A.M.C. 2697 (4th Cir.1981); T.J. Stevenson & Co., Inc. v. 81,193 Bags of Flour, 449 F.Supp. 84, 124 (S.D.Ala.1976), affirmed in part, reversed in part 629 F.2d 338 (5th Cir.1980), rehearing denied 651 F.2d 779 (1981).

5. *T.J. Stevenson & Co.*, 449 F.Supp. at 124–25.

**§ 10–11**

1. The Carriage of Goods by Sea Act (COGSA), 46 U.S.C. § 1303(7) provides as follows:

> After the goods are loaded the bill of lading to be issued by the carrier, master, or agent of the carrier to the shipper shall, if the shipper so demands, be a "shipped" bill of lading: *Provided*, That if the shipper shall have previously taken up any document of title to such goods, he shall surrender the same as against the issue of the "shipped" bill of lading, but at the option of the carrier such document of title may be noted at the port of shipment by the carrier, master, or agent with the name or names of the ship or ships upon which the goods have been shipped and the date or dates of shipment, and when so noted the same shall for the purpose of this section be deemed to constitute a "shipped" bill of lading.

The shipped ("on board") bill of lading is to be distinguished from temporary forms of receipts which may be given preliminary to the shipped bill of lading. An example of such a preliminary document is the mate's receipt or dock receipt which is given to establish the delivery of cargo into the custody of the stevedore or the carrier. Dock receipts most frequently are given upon the receipt of goods on a dock rather than on a vessel. The carrier also may give a "received for shipment" bill of lading which signifies the seller has delivered his cargo at the wharf. Where a clean "on board" bill is issued, exceptions or notations on a dock receipt are no longer pertinent to determine the condition of the goods at the beginning of the voyage. See Woodhouse, Drake & Carey, Inc. v. M/V Righteous, 710 F.2d 1523, 1528, 1984 AMC 479 (11th Cir.1983).

A dock receipt or even a "received for shipment" bill of lading is normally insufficient in a commercial transaction because neither document gives assurance that the shipment has already begun. Where payment of the purchase price is arranged under a documentary credit (see § 10–1 supra), the terms of the credit normally provide that the bill of lading tendered must be "clean, on board, to order and blank endorsed." A "received" bill will not satisfy these conditions and can thus be rejected by the bank issuing the letter of credit (as well as the buyer of the goods).

Various types of container, through, and combined transport bills of lading are not shipped ("on board") bills but merely state that goods have been received for shipment. This is permissible and such a bill may be accepted by a bank even though it does not contain a "shipped on board" endorsement. See Article 23(b), ICC Uniform Customs and Practice for Documentary Credits (1983). Buyers or other parties who arrange for credit should specify that an "on board" endorsement on the bill of lading is not required.

There are many different types of bills of lading. Some of the principal categories are as follows:

(1) Conventional and/or Through Bills of Lading Issued on Liner Terms.

(2) Short Form or "Blank Back" Bills of Lading

(3) Combined Transport Bills of Lading

(4) Bills of Lading Issued Under a Charter Party

(5) Bills of Lading Issued by a Freight Forwarder or NVOCC.

Bills of lading is a creation of mercantile custom dating back at least to medieval times; they came into general use in the sixteenth century. The bill of lading may serve three different functions:

(1) A formal receipt and acknowledgement that goods of a certain kind, quantity, and condition have been handed over for shipment;

(2) A memorandum of the contract of affreightment concluded between the carrier and the shipper; and

(3) A document of title to the goods themselves which enable the shipper to sell them by endorsement and delivery of the bill of lading.

When goods are shipped by sea the bill of lading may be issued in a set of three or four duplicate originals, and a copy may be kept aboard ship.[2] The typical bill contains the names of the shipper and consignee, a description of the goods, including shipping marks used for identification purposes, stipulations for payment of freight, and details of the conditions of carriage.[3]

2. If three copies are issued, one will be kept by the master or broker, and one or two will be sent by express mail to the buyer or consignee. It is often inadvisable to issue duplicate originals of the bill of lading because the Pomerene Act, 49 U.S.C. § 80112, provides as follows:

> **(a) Parts and sets.**—A negotiable bill of lading issued in a State for the transportation of goods to a place in the 48 contiguous States or the District of Columbia may not be issued in parts or sets. A common carrier issuing a bill in violation of this subsection is liable for damages for failure to deliver the goods to a purchaser of one part for value in good faith even though the purchase occurred after the carrier delivered the goods to a holder of one of the other parts.

In modern practice the custom of issuing duplicate bills is rarely necessary. If the original bill of lading is lost, it will be necessary to obtain a bank guarantee (at a cost of about 1 percent of the cargo) to get delivery of the goods. The function of the bank guarantee is to protect and indemnify the delivering carriers.

The ocean bill of lading has an interesting history. The ocean bill of lading began—at least in English practice—as an appendage of the charter party and the contract of affreightment. Merchant's practices, however, transformed the bill of lading into a document of title in the nineteenth century. Now, with the advent of containerization, multimodalism, and electronic communications, the importance of the ocean bill of lading is waning. The traditional ocean bill of lading is being replaced by waybills, through, and multimodal bills of lading. For a comprehensive review, see Boris Kozolchyk, Evolution and Present State of the Ocean Bill of Lading from a Banking Law Perspective, 23 J Mar L & Com. 161 (1992).

3. COGSA, 46 U.S.C. § 1303(3), provides as follows:

> After receiving the goods into his charge the carrier, or the master or agent of the carrier, shall, on demand of the shipper, issue to the shipper a bill of lading showing among other things—
>
> (a) The leading marks necessary for identification of the goods as the same

In private carriage[4] the bill of lading may serve only as a receipt; but in common carriage the bill of lading issued by the carrier is also evidence of the contract of carriage.[5] As such it governs the relationship of the parties before delivery of the goods. The provisions of the bill of lading will be strictly construed against the issuer or draftsman,[6] and separately negotiated or added terms will prevail over the printed form of the contract.[7] The terms of the bill of lading may supersede an earlier term or agreement negotiated between the parties unless it is specifically preserved in the bill of lading.[8]

are furnished in writing by the shipper before the loading of such goods starts, provided such marks are stamped or otherwise shown clearly upon the goods if uncovered, or on the cases or coverings in which such goods are contained, in such a manner as should ordinarily remain legible until the end of the voyage.

(b) Either the number of packages or pieces, or the quantity or weight, as the case may be, as furnished in writing by the shipper.

(c) The apparent order and condition of the goods: *Provided,* That no carrier, master, or agent of the carrier, shall be bound to state or show in the bill of lading any marks, number, quantity, or weight which he has reasonable ground for suspecting not accurately to represent the goods actually received, or which he has had no reasonable means of checking.

4. In private carriage, the Pomerene Bills of Lading Act, the Carriage of Goods by Sea Act, and the Harter Act do not apply. See supra § 10–3. See also Alamo Barge Lines, Inc. v. Rim Maritime Co., Ltd., 596 F.Supp. 1026, 1035, 1985 AMC 2540 (E.D.La.1984).

Where goods are shipped under a charter party, but a bill of lading is negotiated to a third-party, the bill of lading, not the charter party, is the contract of carriage. Cargill, Inc.v. Golden Chariot MV, 31 F.3d 316, 1995 A.M.C. 1077 (5th Cir.1994).

5. Amerada Hess Corp. v. SS Phillips Oklahoma, 558 F.Supp. 1164, 1983 A.M.C. 1528 (S.D.N.Y.1983), B. Elliott (Canada) Ltd. v. John T. Clark & Son of Maryland, Inc., 704 F.2d 1305, 1983 A.M.C. 1742 (4th Cir.1983); West India Industries, Inc. v. Tradex, Tradex Petroleum Services, 664 F.2d 946, 1983 A.M.C. 1992 (5th Cir.1981); Sea-Land Serv., Inc. v. Amstar Corp., 690 F.Supp. 246, 1990 AMC 791 (S.D.N.Y.1988). In Luckenbach S.S. Co. v. American Mills Co., 24 F.2d 704, 1928 AMC 558 (5th Cir. 1928), a bill issued after a fire destroyed the goods was held to evidence the contract the parties entered into at the time the goods were delivered and accepted.

6. Courts construe a bill of lading strictly against the party that drafted it. The Caledonia, 157 U.S. 124, 137, 15 S.Ct. 537, 543, 39 L.Ed. 644 (1895) ("As the exceptions [in the bill of lading] were introduced by the shipowners themselves in their own favor, they are to be construed most strongly against them. * * *"); Mitsui & Co., Ltd. v. American Export Lines, Inc., 636 F.2d 807, 822–23, 1981 A.M.C. 331 (2d Cir.1981) ("ocean bills of lading are contracts of adhesion ambiguities in which must be resolved against the carrier"); Toyo Kisen Kaisha v. W.R. Grace & Co., 53 F.2d 740, 744 (9th Cir.1931) ("a bill of lading is to be construed strictly against the carrier"); E. Gerli & Co. v. Cunard S.S. Co., 48 F.2d 115, 116 (2d Cir.1931) (L. Hand, J.) ("the language of a bill of lading must be taken against the carrier"); Baltimore & O.R.R. Co. v. Doyle, 142 Fed. 669, 673 (C.C.A.3 1906) ("Any reasonable doubt as to the proper interpretation of the contract should be resolved against the [carrier]. It chose the language incorporated in the printed portions of the bill of lading."); see also Tessler Bros. (B.C.) Ltd. v. Italpacific Line, 494 F.2d 438, 444–45, 1974 A.M.C. 937 (9th Cir.1974); Encyclopaedia Britannica, Inc. v. S.S. Hong Kong Producer, 422 F.2d 7, 15 (2d Cir.1969); United States v. Strickland Transp. Co., 200 F.2d 234, 235 (5th Cir.1952) ("if it could be considered that there is an ambiguity in the tariff and it is not made clear under which rating the articles shipped come, the ambiguity must be resolved in favor of the shipper").

7. B. Elliott (Canada) Ltd. v. John T. Clark & Son of Maryland, Inc., 704 F.2d 1305, 1983 A.M.C. 1742 (4th Cir.1983).

8. West India Industries, Inc. v. Tradex, Tradex Petroleum Services, 664 F.2d 946, 1983 A.M.C. 1992 (5th Cir.1981). In Transmarine Corp. v. Charles H. Levitt & Co., Inc., 25 F.2d 275 (2d Cir.1928) an oral contract preceded the issuance of the bill of

## Applicable Law

The principal law governing bills of lading issued in the United States is the Pomerene Bills of Lading Act.[9] This statute applies to bills of lading "issued a common carrier for the transportation of goods * * * (1) between a place in a State and a place in another State; (2) between a place in a State and a place in the same State through another State or a foreign country; or (3) from a place in State to a place in a foreign country.[10] The Pomerene Act[11] thus governs bills of lading issued in the United States or its territories in interstate or foreign commerce, and state law is superseded. Bills of lading issued outside the United States are governed by the general maritime law, considering relevant choice of law rules."

The Pomerene Bill of Lading Act distinguishes between straight bills and order bills of lading. A straight bill of lading consigns the goods to a specified person.[12] An order bill of lading states that the goods are consigned to the order of any person named in the bill.[13]

## Straight Bills and Order Bills

An order bill of lading is negotiable by endorsement of the order party and delivery of the bill. The endorsement may be in blank

lading. The court held that the later issued bill "took the place of the prior oral contract as the final memorial of the parties' obligations." 25 F.2d at 277. However, if goods have been dispatched beyond recall under the oral contract before the issuance of the bill, the oral agreement will control. Id.

The rule under English law on this point is that the bill of lading merely "evidences" the contract between the parties, and an earlier agreement or term will prevail over the bill of lading. See The Ardennes, [1951] 1 K.B. 55 (undertaking to ship directly to London held to override a clause in the bill of lading permitting a deviation). Under English law, however, the terms of the bill of lading nevertheless will control as against the *consignee*. See Debattista, The Bill of Lading as the Contract of Carriage—A Reassessment of Leduc v. Ward, 45 Mod.L.Rev. 652 (1982).

The English rule seems to be the correct one and is consistent with the strict construction of the bill of lading against the party who drafted it.

9. 49 U.S.C. §§ 80101–80116.

10. 49 U.S.C. § 80102. See Industria Nacional Del Papel, C.A. v. M/V Albert F, 730 F.2d 622, 1985 AMC 1437 (11th Cir. 1984).

11. In determining which law should apply, courts should consider such factors as the place of issuance; the port of discharge and loading; and the nationality, residence, and place of business of the parties. See Restatement (Second) of Conflict of Laws §§ 187–188 (1971). A choice of law provision in a bill of lading should be given effect if the law chosen has a reasonable relation to the parties and the transaction and is not contrary to a fundamental policy of the forum state. Id. A choice of foreign law in a bill of lading issued in the United States should not be applied, however, because it would contravene the express language of the Pomerene Act, that such bills are to be governed by the Act. By contrast, a choice of foreign law in an in-bound bill of lading issued in a foreign country may be upheld. North River Ins. Co. v. Fed Sea/Fed Pac Line, 647 F.2d 985, 1982 A.M.C. 2963 (9th Cir.1981).

If United States law is found to apply to an in-bound bill outside the scope of the Pomerene Act, the courts will fashion a general maritime law rule considering the Pomerene Act and Article 7 of the Uniform Commercial Code, which applies to warehouse receipts, bills of lading, and other documents of title. See David Crystal, Inc. v. Cunard S.S. Co., 223 F.Supp. 273, 284–86 (S.D.N.Y.1963), affirmed 339 F.2d 295 (2d Cir.1964).

12. 49 U.S.C. § 80103(b).

13. 49 U.S.C. § 80103(a).

(converting the bill to a bearer instrument transferable by delivery alone) or special to a named person.[14]

The negotiability feature of the order bill of lading means that it functions as a *document of title*. The goods are merged with the instrument, and the owner (holder) of the bill of lading has title to the goods. The seller thus can retain control of goods in transit by requiring the payment of the purchase price before the bill is delivered to the buyer.[15] An intermediary bank that extends credit is fully protected by becoming a consignee or by retaining possession of the bill. The goods can be transferred or resold by negotiation of the bill. The carrier satisfies its duty to deliver by delivery of the goods against the bill.[16] If the carrier delivers goods without taking up and canceling the order bill of lading, it remains liable to anyone who has purchased the bill for value and in good faith before or after the delivery of the goods.[17] In addition, the carrier, the issuer of the bill of lading, is responsible for releasing the cargo only to the party who presents the original bill of lading. If the carrier delivers the goods to someone other than the authorized holder of the bill of lading, the carrier is liable for misdelivery.[18]

A straight bill of lading, on the other hand, is not negotiable. A straight bill must contain the words "non-negotiable" or "not negotiable," on its face.[19] The duty of a carrier under a straight bill is to deliver the goods to the named consignee [20] unless the carrier:

> (a) Had been requested, by or on behalf of a person having a right of property * * * to make such delivery, or
>
> (b) Had information at the time of the delivery that it was to a person not lawfully entitled to possession of the goods.[21]

The carrier is not required to take up and cancel a straight bill of lading at the time of delivery of the goods,[22] but it is prudent to do so.

14. 49 U.S.C. § 80104.

15. This is accordingly much more effective than resort to the remedy of stoppage in transit.

16. 49 U.S.C. § 80110(b).

17. 49 U.S.C. § 80111. The one exception to this principle is the case where an order bill of lading has been issued to a thief of the goods. In such a case the goods may be returned to the true owner and the carrier is protected even as to good faith purchasers of the bill. 49 U.S.C. §§ 89(a) and 90. The carrier is also protected if, before notice of the true owner's claim, he has delivered the goods to the holder of the bill. Id. The carrier may use the interpleader remedy in the case of conflicting claims to goods. 49 U.S.C. §§ 97 and 98.

18. Allied Chemical Int'l Corp. v. Companhia de Navegacao Lloyd Brasileiro, 775 F.2d 476, 481, 1986 AMC 826 (2d Cir.1985); David Crystal, Inc. v. Cunard Steamship Co., 339 F.2d 295, 298 (2d Cir.1964).

See generally, McCune, Delivery of Cargo Carried under Straight Bills of Lading: The Ocean Carrier's Rights and Obligations, 17 Uniform Comm'l. Code L.J. 344 (1985).

19. 49 U.S.C. § 80103(b)(2). The legal status of a straight bill that omits this legend is unclear. It would not seem to be an order bill. The prudent carrier should investigate before delivery of the goods.

20. 49 U.S.C. § 80110(b).

21. 49 U.S.C. § 80111(a).

22. In Gold Medal Trading Corp. v. Atlantic Overseas Corp., 580 F.Supp. 610, 1984 AMC 2052 (S.D.N.Y.1984), the carrier delivered the goods shipped under a straight bill of lading to the named consignees, disregarding the instructions of the

## Waybills

The requirements of intermodal carriage, shipment of goods in containers, and other technological advances have produced new types of shipping documents with different functions than the traditional ocean bill of lading. An increasingly popular and useful alternative is to ship goods under a non-negotiable receipt known as a liner (sea) waybill. This is a contract for the shipment of goods (including loading and delivery by the carrier) by which the carrier undertakes to deliver the goods to the consignee named in the document.[23] Accordingly, in contrast to the traditional bill of lading, the liner waybill is non-negotiable. The goods may be delivered to the consignee who identifies himself as such. The waybill is not a document of title, but merely conveys information. Since the physical document is no longer necessary to the transaction, the liner waybill may be transmitted electronically or telexed between the parties.[24] As a non-negotiable bill of lading, the liner waybill is subject to the Pomerene Act and the Harter Act under American law. The Hague (or Hague/Visby) Rules are generally incorporated by a standard clause on the face of the waybill.[25]

shipper to deliver them only against the presentation of the original bill of lading. The court held the carrier liable to the shipper for misdelivery of the goods on the basis of 46 U.S.C. § 80111(a), which was interpreted to mean that the carrier was bound to follow the shipper's instructions.

**23.** See generally Tetley, Waybills: The Modern Contract of Carriage of Goods by Sea, Part I, 14 J.Mar.L. and Com. 465 (1983) and Part II, 15 J.Mar.L. and Com. 41 (1984).

**24.** A drawback to the widespread use of waybills is the need to accommodate shipment of cargo that is sold—sometimes several times—en route and cargo that is pledged to a bank financing the transaction. These problems can be overcome through the establishment of an automated bill of lading registry so that delivery instructions can be changed and cargo released only if the lien in favor of the financing bank has been satisfied.

**25.** The waybill would thus be subject to COGSA under American law. COGSA does not apply by its terms since it is limited to documents of title. COGSA can apply, however, by agreement of the parties.

A sea waybill can be issued as a short form or blank back document that incorporates the carrier's tariffs and the Hague–Visby Rules or COGSA by reference. The principal advantages of the waybill are:

1. It does not have to be produced to obtain the goods; thus delays in transmitting the bill are rendered irrelevant;

2. The goods can be transferred easily in open account transactions where the parties are used to dealing with each other; and

3. It facilitates intercompany transfers of goods.

The sea waybill can even be used in a documentary credit transaction where agreed upon by the parties and permitted in the letter of credit.

The current use of the waybill in international trade is addressed by William J. Coffey, Multimodalism and the American Carrier, 64 Tul.L.Rev. * 569, 588–589 (1989):

> The waybill is a form of document commonly used in other modes of transportation, most notably the airlines and the trucking industry. Waybills are also in common use in some short sea trades, particularly among European nations. The General Council of British Shipping, for example, has published a standard form of waybill that may be used by any carrier.
>
> The waybill is not substantially different from the nonnegotiable ocean bill of lading. It too serves as a receipt for the goods and as the contract of carriage, albeit typically in a shorter form than the ocean bill itself. The straight bill of lading defined by the Pomerene Act is really nothing more than a waybill.
>
> Waybills are far more preferable for the carrier than the negotiable bill

## Electronic Data Interchange

Electronic Data Interchange (EDI) now allows communications, including bills of lading to be transmitted instantaneously between shippers, carriers, and third parties. Applicable tariffs can also be accessed by EDI, and freight payments as well as payments for goods can be made through such systems. In the future it will be necessary for the legal system to accommodate the paperless movement of cargo in international trade.[26]

## Major Terms and Conditions

On the reverse side of a "long form" bill of lading are printed, in fine print, various terms and conditions. This part of a bill of lading is a contract of adhesion in the sense that the terms and conditions are not subject to negotiation. Furthermore, since the bill of lading is on a form drafted by the carrier, the terms and conditions will be in the carrier's favor. The carrier, however, is not pleased to draft terms and conditions that violate the Carriage of Goods by Sea Act (COGSA), which therefore imposes a substantial limit to the one-sided nature of the bill of lading. A term or condition that violates COGSA will be void and unenforceable.[27] The following are the most important terms and conditions normally found on the reverse side of a bill of lading.

With waybills, there are no problems with lost originals, and a waybill could be issued with five copies or less, a far cry from the multitudinous sets of bills, including three originals, that are the accepted practice today. There would rarely be a question as to the identity of the consignee, and the likelihood of fraud would be substantially lessened.

Why are waybills not in common use? The answer is quite simple—shippers generally prefer the present system and the flexibility of having a negotiable bill, without which international trade would soon be brought to a standstill.

A negotiable bill of lading, properly endorsed and in the hands of a holder in due course, is a document of title that will be recognized virtually anywhere in the world. It may be lengthy, but its terms and clauses are generally understood and accepted, factors of great importance to the purchaser. If the original bill is lost, a bank guarantee normally can be obtained at a cost of less than one percent of the cargo value covered by the bill, and the guarantee will fully protect and indemnify the delivering carriers as well.

The negotiable bill probably will long be with us. On the flip side of the same coin, the paperless bill probably will not come into widespread use for virtually the same reason. With some notable exceptions, shippers, consignees, and their bankers simply do not want and will not accept such a system.

* Reprinted with the permission of the Tulane Law Review.

26. Various groups and task forces are working on these matters. See The Commercial Use of Electronic Data Interchange—A Report and Model Trading Partner Agreement, 45 The Bus.Law 1645 (1990). The Comite Maritime International (CMI) has adopted rules on the transmission of bills of lading by EDI. See Richard Breet Kelly, The CMI Charts a Course on the Sea of Electronic Data Interchange: Rules for Electronic Bills of Lading, 16 Tul. Mar.L.J. 349 (1992).

See Alan Asay, Drafting Electronic Bilk of Lading, (1999) Int'l J. of Shipping Law 207; C.C. Nicoll, Bolero Makes the Bill of Lading Obsolete, (1999) 7 Int'l M. L. 148.

27. Plywood Panels, Inc. v. M/V Sun Valley, 804 F.Supp. 804, 1993 AMC 516 (D.Va.1992).

### 1. *The Clause Paramount*

The function of the "Clause Paramount"[28] is to specify the law to be applied to the contract of carriage. In a sense the Clause Paramount is redundant, at least in common carriage where COGSA applies by force of law. However, in every bill of lading the Clause Paramount will provide that the applicable law is COGSA. Of course, foreign bills of lading will specify other laws such as the English Carriage of Goods by Sea Act of 1971, the Hague Rules, or the Hague/Visby Rules.

In the case of private carriage, the Clause Paramount plays an important function, which is to specify the applicable law by agreement. The applicable law to be COGSA by agreement of the parties.

### 2. *The Responsibility for Conveyance Clause*

This clause specifies where the carrier's responsibility shall commence and where it shall terminate and recites that loss or damage occurring before or after that time is not compensable.

In multimodal and through transport, the conveyance clause plays an important function: The specification of the carrier's responsibility where the loss or damage occurs during on-carriage by an agent or subcontractor of the carrier.

### 3. *Discharge and Delivery*

The discharge and delivery clause provides that the carrier may commence discharge of the cargo on arrival without notice to the consignee. This function gives the carrier the freedom to unload and stow the goods as it sees fit. Of course, the obligation of the carrier to handle the goods carefully remains.

### 4. *Acknowledgement of Weight/Quality Marks*

This clause provides that the carrier does not accept responsibility for information supplied by the shipper as to the quantity, weight, or quality of the goods carried. It further provides that the carrier is responsible only for the leading marks if they are clearly shown on packages for other cargo containers.

### 5. *Voyage Clause*

The voyage or liberties clause provides that the ship is free to sail without tugs or pilots and may proceed by any route at the carrier's or master's discretion. Moreover, the carrier is free to sail before or after advertised sailing dates.

28. For judicial comment on the Clause Paramount, see Z.K. Marine, v. M/V Archigetis, 776 F.Supp. 1549, 1991 AMC 1434 (S.D.Fla.1991); Leather's Best Int'l, Inc. v. M/V Lloyd Sergipe, 760 F.Supp. 301, 1991 AMC 1929 (S.D.N.Y.1991); Insurance Co. of North America v. M/V Ocean Lynx, 901 F.2d 934, 1991 AMC 64 (11th Cir.1990); Louis Dreyfus Corp. v. 27,946 Long Tons of Corn, 830 F.2d 1321, 1988 AMC 1053 (5th Cir.1987).

### 6. *Deck Cargo*

This clause excludes responsibility for cargo that is stated to be carried on deck and is so carried. Thus, the carrier accepts responsibility implicitly for goods that are in fact stowed on deck but which are covered by an under-deck bill of lading.

### 7. *Carriers' Liberties in the Event of Blockade or Delay*

This clause gives the carrier liberty to proceed to any convenient port and to discharge goods when the voyage is threatened by war, hostilities, blockade, quarantine, port congestion, civic commotions, or other incidents beyond the carrier's control which may result in damage to the vessel or risk of her capture or seizure.

### 8. *Container Clause*

Most bills of lading state that the carrier is entitled to open and inspect the contents of shiver pack containers and may abandon the transportation if they are considered to be unsafe. Typically, provision is made also for the repackaging of containers and their repositioning.

### 9. *Port Customs, Consular, and Other Regulations*

This clause requires that shippers furnish all particulars necessary to enable a bill of lading to comply with government regulations.

### 10. *The Transshipment Clause*

This clause gives the carrier freedom to transship the goods by any means. The clause also typically provides for limitations on the liability of the carrier if damage occurs while the goods are in the possession of a transshipment carrier.

### 11. *Dangerous, Inflammable, or Radioactive Goods*

The Hague Rules Article IV, Rule 6, as well as COGSA provide that dangerous goods must not be presented for shipment without the knowledge of the carrier; and if they are so shipped, the carrier has the right to land them and render them innocuous without compensation to the shipper. The function of this clause in a bill of lading simply is to restate and emphasize the rules regarding dangerous cargo.

### 12. *Claims*

The function of this clause is to track the limitation of liability provisions of applicable law such as COGSA.

### 13. *Freight*

The freight clause stipulates the way that the payment of freight shall be handled. In many cases this clause provides that the freight shall be deemed earned on shipment which changes the general rule that freight is deemed earned only upon delivery of the goods.

### *14. Lien*

This clause gives the carrier, its servants, and agents a lien on the goods in the event of an unsatisfied debt by the shipper.

### *15. General Average*

This clause typically stipulates that general average shall be payable and adjustable according to the York–Antwerp Rules initial caps.

### *16. Both-to-Blame Collision Clause*

The purpose of this clause is to divide between the carrier and the owner of the goods damages resulting from loss of cargo in the event of a collision through the common fault of the carrying ship and another vessel. The standard wording of this clause is as follows:

> If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, Mariners, pilots or the servant of the Carrier in the navigation or in the management of the ship, the Owners of the goods carried hereunder will indemnify the carrier against all loss or liability to the other non-carrying ship or her Owners in so far as such loss or liability represent loss of, or damage to, or any claim whatsoever of the Owners of the said goods, paid or payable by the other or non-carrying ship or her Owners to the Owners of the said goods and set off, recouped or recovered by the other or non-carrying ship or her Owners as part of their claim against the carrying ship or Carrier. The foregoing provisions shall also apply where the Owners, Operators or those in charge of any ship or ships or objects other than or in addition to the colliding ships or objects are at fault in respect to a collision or contact.

The effect of this clause is to apply the rule of the 1910 Brussels Collision Convention, which the United States, however, has not ratified. Thus, there is substantial doubt that the both-to-blame collision clause has any effect under U.S. law.

### *17. The New Jason Clause*

The New Jason clause is necessary because Rule D of the New York–Antwerp Rules is not valid in the United States. The effect of this clause is to apply Rule D to the particular shipment. A typical New Jason clause is as follows:

> In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequences of which, the Carrier is not responsible, by statute, contract or otherwise, Shippers, Consignees and/or Owner of the goods shall contribute with the Carrier in General Average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the goods.

### *18. Rights and Immunities of All Servants and Agents of the Carrier*

This clause, which is commonly known as a "Himalaya" clause, extends the provision of the applicable law, such as COGSA, in the United States to servants or agents of the carrier as well as independent contractors. A typical Himalaya clause is as follows:

> No servant or agent of the carrier (including every independent contractor from time to time employed by the carrier) shall in any circumstances whatsoever be under any liability whatsoever to the shipper, consignee or owner of the goods or to any holder of this bill of lading for any loss, damage, or delay of whatsoever kind arising resulting directly or indirectly from any act neglect or default on his part while acting in the course of or in connection with his employment and, but without prejudice to the generality of the foregoing provisions in this clause, every exemption, limitation, condition and liberty herein contained and every right, exception from liability, defence and immunity of whatsoever nature applicable to the carrier or to which the carrier is entitled hereunder shall also be available and shall extend to protect every such servant or agent of the carrier acting as aforesaid and for the purpose of all the foregoing provisions of this clause the carrier is or shall be deemed to be acting as agent or trustee on behalf of and for the benefit of all persons who are or might be his servants or agents from time to time (including independent contractors as aforesaid) and all such persons shall to this extent be or be deemed to be parties to the contract in or evidenced by this bill of lading.

### *19. Agency Clause*

This clause, also known as the demise clause, provides that if the carrying ship is not owned or chartered by demise, the bill of lading is effective only as a contract with the owner or the demise charterer.

The purpose of the demise clause was originally to protect time charterers from becoming liable as parties to a bill of lading at a time when they were unable to claim the protection of COGSA or limit their liability under American and English law.

### *20. Jurisdiction Clause*

Many bills of lading stipulate the form for litigation arising out of claims as well as the applicable law. This is another case where the courts may not allow the clause to have full effect.

Although the bill of lading and its terms and conditions constitution evidence of affreightment, wherever COGSA applies or other national law, the courts will carefully scrutinize the bill of lading to determine whether it exceeds the limits imposed by applicable statutory law or by the statutory law mandated to apply to bills of lading and carriage of goods.