UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

HDI GLOBAL INSURANCE CO.,

                        Plaintiff,

       -v-

KUEHNE + NAGEL, INC.,

                  Defendant.

------------------------------------------------------------------X

:
:
:
:
:
:
:
:
:
:
:
:
:

**23-cv-6351 (LJL)**

**OPINION AND ORDER**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 02/10/2025

LEWIS J. LIMAN, United States District Judge:

On October 6, 2022, a container containing 24 pallets of electrical wire harnesses fell into the water while it was being loaded onto the vessel Chicago Express at the Port of Barcelona in Spain. Dkt. No. 47; PX-11 at PLF000056. The electrical wire harnesses (the "Cargo") were sold by non-party Electrical Components International of Spain ("ECI") to non-party Mahle Behr Charleston Inc. ("Mahle") and were destined for Charleston, South Carolina. Dkt. No. 47. The Cargo was ruined by saltwater contamination. *Id.* Plaintiff HDI Global Insurance Co. ("Plaintiff" or "HDI") insured Mahle for the loss of or damage to the Cargo and, as such, is Mahle's subrogee for claims related to the Cargo. *Id.* Defendant Kuehne + Nagel Inc. t/a Blue Anchor America Line ("Defendant" or "K+N") was the non-vessel-operating common carrier ("NVOCC") and customs broker with respect to the Cargo. Dkt. No. 70 ("Trial Transcript" or "Tr.") 74:2–4; 97:7–13.

On July 21, 2023, HDI sued K+N in this Court under the United States Carriage of Goods by Sea Act ("COGSA"), Apr. 16, 1936, ch. 229, title I, § 4, 49 Stat. 1210,[1] for the value

---

[1] Originally codified in Title 46 Appendix of the United States Code, 46 U.S.C. app. § 1304(5),

of the damaged Cargo.  Dkt. No. 1.  After the Court denied cross-motions for summary judgment, the parties agreed to a bench trial limited to the question whether the smaller "carton" in which the electrical wire harnesses were contained or the larger pallet that contained the cartons should be considered the "package" for COGSA limitation purposes.  Dkt. No 47 at 2. The parties stipulated that should the Court determine that the carton is the "package," judgment should be entered for the Plaintiff in the amount of $119,967.99, and that should the Court determine that the pallet is the "package," judgment should be entered in favor of Plaintiff for $12,000.  *Id.*

The Court held a bench trial on January 15, January 23, and January 27, 2025.  One witness, Rebecca Chavez (Mahle, Head of Logistics), testified in-person for the Plaintiff.  Two witnesses testified in-person for Defendant: Jenette Prince (K+N, VP, Trade Control–Import and Export) and Rebecca Chavez.  In addition, the Court received remote testimony from D. Marcos Ruiz Perez (ECI, Supervisor, Logistics Department) for the Plaintiff and Figen Usenmez-Mertsoy (K+N, Sea Logistics Customer Care Manager) for the Defendant.  The declarations of the witnesses were received as Court Exhibits and were used as their direct testimony at trial. *See* Jan. 15, 2025 Minute Entry; Jan. 23, 2025 Minute Entry.  The Court also received into evidence portions of the 30(b)(6) deposition of Nancy Nuellen (Mahle, Logistics Material Planner), who did not testify.  *See* Tr. 132:20–133:15.

---

later moved to a statutory note following 46 U.S.C. § 30701.  Pub. L. 109-304, § 6(c), Oct. 6, 2006, 120 Stat. 1516.  Citations in this opinion use the section designations from the original public law.

This Opinion and Order constitutes the Court's findings of fact and conclusions of law for purposes of Federal Rule of Civil Procedure 52(a)(1). To the extent any statement labeled as a finding of fact is a conclusion of law, it shall be deemed a conclusion of law, and vice versa.[2]

## FINDINGS OF FACT

### I.    The Relevant Parties

Mahle is a manufacturer of radiators and HVAC systems for the automobile industry. Tr. 6:13–16. It purchases electrical wire harnesses for use in the manufacture of HVAC units for automotive clients such as BMW. Tr. 6:17–19, 31:15–22.

ECI manufactures electrical wire harnesses for appliances and automobiles. Tr. 143:18–144:2. It is headquartered in Morocco but maintains a logistics center in Zaragoza, Spain, from which it ships goods to its customers. Tr. 144:3–14, 146:9–10.

Plaintiff HDI is an insurance company that provides insurance to Mahle and is subrogated to it for the purposes of this claim. Dkt. No. 1 ¶ 1.

Defendant K+N is a non-vessel-operating common carrier ("NVOCC") which provides ocean transportation, among other things, but does not operate the vessels that engage in ocean transportation. Tr. 52:25–54:12. It also occasionally acts as a customs broker, including for Mahle. Tr. 94:9–13. For shipments originating from Spain, K+N acts in part through its Spanish agent and affiliate, Kuehne + Nagel Zaragoza, sometimes referred to as the "origin" office. Tr. 52:22–53:9, 96:1–3.

---

[2] The Court previously issued a version of this Opinion and Order which included an unredacted bank account number and was filed at Dkt. No. 74. The Court directed the Clerk of Court to seal that version of this Order. Dkt. No. 75. This Opinion and Order is identical to that filed at Dkt. No. 74, with the exception that the bank account number is redacted.

## II.      The Shipment at Issue

Mahle and ECI have had a customer-supplier relationship for at least 14 years.  Tr. 5:19–21, 149:10–16.  Pursuant to that relationship, ECI supplies Mahle with wire harnesses on a monthly, if not weekly, basis.  Tr. 5:22–24.  The companies follow a consistent practice.  ECI manufactures electrical harnesses at its factory in Morocco.  Tr. 143:18–23.  After Mahle places an order with ECI for electrical harnesses, ECI packs the harnesses into cartons and then onto pallets for delivery to ECI's logistics center in Zaragoza, Spain.  Tr. 144:3–146:2, 160:1–8.  Based on Mahle's order, ECI generates an invoice and a packing list which ECI sends to Mahle's designated NVOCC, K+N, for K+N to confirm with Mahle through a process known by the parties as "green-lighting."  Tr. 30:15–31:7, 96:4–10.  Once the order is "greenlit" by Mahle for delivery to it in the United States, K+N picks up the pallets at ECI's Zaragoza warehouse and carries them by truck to Barcelona, where they are loaded into containers and then shipped to the United States.  Tr. 158:8–18.  The containers are then unloaded in the United States and delivered to Mahle in Charleston, South Carolina, where a forklift takes the pallets and stores them in Mahle's warehouse.  Tr. 17:23–18:3, 38:20–22, 96:11–25.  As a general matter, the pallets are left intact from the moment they leave ECI's facility in Morocco to the moment they arrive at Mahle's warehouse in the United States.  Tr. 160:5–8. [3]

Mahle's packaging requirements for each specific product purchased from ECI are set forth in a Unit Load Data Sheet ("ULD") created at the beginning of the supplier relationship between Mahle and ECI.  Tr. 6:4–10, 7:9–9:8, 33:6–13.  The ULD dictates exactly how each type of product is to be shipped to Mahle.  *Id.*  For the products at issue, Mahle's ULDs

---

[3] In some cases, product that is delivered from Morocco to Spain on a pallet is broken down and repalletised when the logistics center in Spain receives on a single pallet product destined for different clients, or when it needs to add materials to the pallet.  Tr. 169:6–12.

instructed ECI to pack the electrical harnesses onto pallets and instructed how many electrical harnesses to pack into a carton and how many cartons to load onto a pallet.  Tr. 7:18–8:4, 10:11–12:6.  It also instructed ECI how to fasten the cartons onto the pallet.  Tr. 8:6–12.

The requirement of palletising the product is a matter of convenience and safety for ECI, Mahle, and their employees.  Tr. 16:25–19:8, 158:24–159:13; DX-4; DX-13 at K+N000282.  In general, Mahle insists that ECI package the product into pallets to make efficient use of container space and so that it is stable and consistent with respect to condition, shape, volume, and stackability.  Tr. 16:25–17:6.  Mahle wants "to make use of space in the containers absolutely, and it should be to the point that we can unload it with a forklift because ergonomic requirements are going to tell us that we have to be able to unload with a forklift so that we don't have any kind of issues with our employees unloading boxes that are not on pallets."  Tr. 17:23–18:3.  It is safer for forklift drivers to unload pallets rather than boxes.  Tr. 18:4–9.  From ECI's perspective, moving a pallet is more efficient than moving each individual box.  Tr. 159:11–13.

The shipment in this case followed that consistent practice.  In or around August and September 2022, Mahle ordered 19,800 wire harnesses from ECI, in four separate orders.  Court Exhibit 4, Declaration of D. Marcos Ruiz Perez ("Ruiz Perez") ¶ 4; DX-2 at K+N000039, 58, 63; DX-3 at PLF000156; Tr. 30:19–31:7.  The electric wire harnesses were manufactured by ECI at its factory in Morocco.  Tr. 143:21–23.  Following the ULDs for each product, ECI then packed the completed product into cartons and packed the cartons onto pallets.  *See* DX-4 (ULDs for each of the four ECI parts at issue); 30(b)(6) Deposition of Nancy Nuellen, Excerpted Portions ("Nuellen Dep.") 22:20–33:14; Tr. 11:21–12:6, 144:20–145:5.  Pursuant to these specific ULDs, the Cargo was packaged in 480 cartons, which were in turn affixed to 24 pallets and wrapped in transparent plastic to secure it to the pallets.  DX-4; Tr. 160:1–161:9; Court Exhibit 1,

Declaration of Rebecca Chavez ("Chavez") ¶ 10; Ruiz Perez ¶ 4; DX-2 at K+N000040, 57, 62; DX-3 at PLF000157.

After ECI packed and secured Mahle's order onto pallets, ECI transported the pallets from Morrocco to Zaragoza, where a forklift operator stored them in ECI's warehouse pending the "greenlight," or final approval, from Mahle to initiate shipment.  Tr. 145:6–146:2.

ECI prepared invoices and packing lists for each of the four orders.  The invoices listed the product purchased by Mahle, the price it was obligated to pay, and the number of pallets the product was to be shipped on, along with the gross and net weight of the shipment.  The packing lists also included the number of cartons.  Tr. 29:25–31:7; Court Exhibit 3, Declaration of Figen Usenmez-Mertsoy ("Mertsoy") ¶ 17; DX-2 at K+N000039, 40, 57, 58, 62, 63; DX-3 at PLF000156–157.

K+N was retained to arrange the transportation and customs clearance of the Cargo from ECI's facility in Spain to Mahle's factory in Charleston, South Carolina, pursuant to a standing arrangement between Mahle and K+N for the latter to act as an NVOCC for ECI shipments to Mahle.  Tr. 149:17–150:3; Mertsoy ¶ 16.  ECI provided copies of the invoices and packing lists to K+N's Spanish affiliate, K+N Zaragoza, indicating that the materials were ready and requesting a booking, K+N Zaragoza then passed the relevant information to K+N, and K+N emailed the invoices and packing lists to a representative of Mahle.  Mertsoy ¶ 12; Court Exhibit 2, Declaration of Jenette Prince ("Prince") ¶ 21; DX-11; Tr. 30:19–31:7, 33:1–5, 95:19–96:3.  Once Mahle indicated to K+N that the shipment was "OK to proceed," i.e., provided the "greenlight," DX-2 at K+N000054, K+N Zaragoza then arranged shipment and prepared a third type of document, a sea waybill, for each of the four sets of invoices and packing lists, Tr.

52:22–53:23, 64:1–6.  Booking was made on the vessel Chicago Express with an estimated

arrival date of October 21, 2022.  DX-11.

K+N's Spanish affiliate picked up the pallets from ECI's Zaragoza warehouse by truck

and transferred them to a K+N warehouse to then consolidate into an oceangoing container.

Chavez ¶ 22; Mertsoy ¶¶ 55–56; Ruiz Perez ¶ 7; Tr. 157:20–158:18.  K+N moved the pallets and

not the individual boxes.  *Id*.

During the loading of the Chicago Express vessel at the Port of Barcelona on October 6,

2022, the container with the pallets of material ordered by Mahle fell into the water, resulting in

the Cargo being contaminated by seawater and ruined.  Tr. 44:9–17; DX-10; DX-11; Dkt. No.

47.

### III.    The Relevant Shipping Documents

As indicated above, three types of shipping documents are customarily prepared by the

parties and are relevant to this case: invoices, packing lists, and sea waybills.  The parties

followed their ordinary course in preparing these documents.

The first two, the invoice and the packing list, were prepared by ECI based on the

information from Mahle's order.  Tr. 29:25–30:12; Mertsoy ¶ 17; DX-2 at K+N000039, 40, 57,

58, 62, 63; DX-3 at PLF000156–157.  These two documents define the contractual relationship

between ECI as the supplier and exporter and Mahle as the customer and importer with respect to

the specific order and are relevant with respect to Customs and logistics.  DX-3 at PLF000156.

The invoice lists the products Mahle is purchasing, the numbers of those products, the

price being charged for them, their delivery location, and the terms on which they are to be

delivered.  *Id.*  It also reflects the number of pallets on which the goods will be shipped and the

gross and net weight of the products with and without the pallets.  *Id.*  In general, the invoice is

used for customs purposes and to memorialize the product the customer is purchasing and the price it must pay for that product. Tr. 24:12–16.

For example, invoice No. 94909608, issued on September 22, 2022, from ECI to Mahle reflects the ten pallets and the 8,200 units contained on those pallets, as well as the price Mahle was to pay for those units being shipped on the ten pallets. It reads in relevant part:

| Conditions | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Payment** | Transfer | | **Delivery** | FCA | | | |
| | Up to 01/05/2023 without deduction | | | Zaragoza (Spain) | | | |
| | SWIFT:BKBKESMM | | **Vendor:** | 3265200 | | | |

| Invoice Details | | | | | | | |
|---|---|---|---|---|---|---|---|
| | **Material Order** | **Denomination Note (Date)** | **Base Amount** | **Price (USD)** | **Quantity** | **Value (USD)** | |
| | 1007123 | WH BEHR BMW 35UP USA KE204002_5.2 | 5.600 PC | | | | |
| | 1007124 | WH BEHR BMW 35UP USA KE199002_4.2 | 1.600 PC | | | | |
| | 1007129 | WH BEHR BMW 35UP USA DN748008_11.2 | 1.000 PC | | | | |
| | **Tax base** | | | | | | 49.753,44 |

```
1990 kg  gross weight.
10  Palets.

Origin of the merchandise: Morocco.
tariff heading: 85444290

This invoice is related to the delivery note 80187054,80187055 and
80187056.
```

DX-2 at K+N000058. The invoice lists the number of units or "PCS," in a column labelled "Base Amount." *Id.* Tellingly, it does not contain the number of boxes. *Id.*

The packing lists contain similar information to the invoice, with the addition of the number of boxes being shipped, how many boxes are on each pallet, and the dimensions of the pallet. DX-2 at K+N000040, 57, 62; DX-3 at PLF000157. The packing list is used as a receipt for shipment and is used by the receiving employees at Mahle to ensure that all ordered units are

accounted for.  Tr. 24:17–25.  When the material arrives in Charleston, South Carolina, Mahle compares the palletised material to what is reflected on the packing list.  Tr. 43:14–19.

The packing list corresponding to invoice No. 94909608 also reflects the ten pallets and the 8,200 units and contains a reference to the boxes that are to be included on each of the pallets.  It reads in relevant part:

| | | | PACKING LIST | | | | | |
|---|---|---|---|---|---|---|---|---|
| 1 | of 10 | --------- | WH BEHR BMW 35UP USA KE199002_4.2 | ------ | 20 | BOX | ------ | 800 UNITS |
| 2 | of 10 | --------- | WH BEHR BMW 35UP USA KE199002_4.2 | ------ | 20 | BOX | ------ | 800 UNITS |
| 3 | of 10 | --------- | WH BEHR BMW 35UP USA DN748008_11.2 | ------ | 20 | BOX | ------ | 1000 UNITS |
| 4 | of 10 | --------- | WH BEHR BMW 35UP USA KE204002_5.2 | ------ | 20 | BOX | ------ | 800 UNITS |
| 5 | of 10 | --------- | WH BEHR BMW 35UP USA KE204002_5.2 | ------ | 20 | BOX | ------ | 800 UNITS |
| 6 | of 10 | --------- | WH BEHR BMW 35UP USA KE204002_5.2 | ------ | 20 | BOX | ------ | 800 UNITS |
| 7 | of 10 | --------- | WH BEHR BMW 35UP USA KE204002_5.2 | ------ | 20 | BOX | ------ | 800 UNITS |
| 8 | of 10 | --------- | WH BEHR BMW 35UP USA KE204002_5.2 | ------ | 20 | BOX | ------ | 800 UNITS |
| 9 | of 10 | --------- | WH BEHR BMW 35UP USA KE204002_5.2 | ------ | 20 | BOX | ------ | 800 UNITS |
| 10 | of 10 | --------- | WH BEHR BMW 35UP USA KE204002_5.2 | ------ | 20 | BOX | ------ | 800 UNITS |

NUMBER OF PALETS: 10
NUMBER OF PACKAGES: 200 BOXES
GROSS WEIGHT: 1990 KG
DIMENSIONS:
10 X 120 X 80 X 120 CM
INVOICE NUMBER: 94909608

DX-2 at K+N000057.

The third document, a sea waybill, is a contract between ECI as the shipper and K+N as the carrier.  It also sets forth Mahle's rights as consignee.  *See, e.g.*, DX–1 at K+N00001–02 ("SWB-1").[4]  K+N or its foreign affiliate prepare the sea waybill on behalf of K+N based on the

---

[4] The four sea waybills at issue, numbered BANQZAZ02153062212-0876-210.011, BANQZAZ02153032212-0876-209.013, BANQZAZ02153052212-0876-210.013, BANQZAZ02153022212-0876-210.012, are contained in DX-1 at K+N00001–08.  Because the form and T&Cs are identical between the four sea waybills, the Court refers to seaway bill number BANQZAZ02153062212-0876-210.011, DX-1 at K+N00001–02, "SWB-1," as the representative example throughout.

invoice and packing list provided by the shipper, after receiving the greenlight from Mahle for the shipment of goods. Tr. 52:22–54:12, 64:1–9; Mertsoy ¶ 14.[5]

The sea waybills are in standard form. SWB-1; DX-1. The front of the sea waybill contains sections to identify and name the Shipper, the Consignee, the Notify Party, and the Delivery Agent. *Id.* It also contains sections for the Place of Receipt, the Port of Loading, the Vessel and Voyage Number, the Port of Discharge, Place of Delivery, whether the movement is CFS/CFS[6] and whether freight is payable at destination. *Id.* The next section, also on the front of the sea waybill, contains the particulars regarding the shipment furnished by the shipper. It has columns for Marks and Numbers, Number of Packages, Description of Goods, Gross Weight kgs, and Measurement. *Id.*

---

[5] Shipping goods under a non-negotiable receipt known as a "liner (sea) waybill" or "sea waybill" is an "increasingly popular and useful alternative" to shipping under a traditional bill of lading. 1 T. J. Schoenbaum, Admiralty & Maritime Law § 10:11 (6th ed. 2019). "This is a contract for the shipment of goods (including loading and delivery by the carrier) by which the carrier undertakes to deliver the goods to the consignee named in the document. Accordingly, in contrast to the traditional bill of lading, the liner waybill is non-negotiable. The goods may be delivered to the consignee who identifies himself as such. The waybill is not a document of title, but merely conveys information. Since the physical document is no longer necessary to the transaction, the liner waybill may be transmitted electronically or telexed between the parties. As a non-negotiable bill of lading, the liner waybill is subject to the Federal Bills of Lading Act and the Harter Act under American law. The Hague (or Hague/Visby) Rules are generally incorporated by a standard clause on the face of the waybill." *Id.* (internal citations omitted); *see also Royal Sun All. Ins., PLC v. Ocean World Lines, Inc.,* 612 F.3d 138, 141 n.5 (2d Cir. 2010); *Herod's Stone Design v. Mediterranean Shipping Company S.A.*, 434 F.Supp.3d 142, 148 (S.D.N.Y. 2020).

[6] In the shipping industry, "CFS" stands for Container Freight Station where cargo is deconsolidated and re-consolidated for shipping purposes. *Container Freight Station*, FLEXPORT, https://www.flexport.com/glossary/container-freight-station/ (last visited Feb. 3, 2025). "CFS/CFS" refers to a mode of transportation where a shipment that is less than a container load ("LCL") will be taken to the CFS at origin to be consolidated into a container with other cargo, and then unloaded and separated out at another CFS at the destination. A "CY/CY" shipment is one in which a full container is shipped from one container yard to another. Tr 83:15–84:6; *see also N.L.R.B. v. International Longshoremen's Ass'n, AFL-CIO*, 447 U.S 490, 497 (1980).

The front of the four sea waybills at issue reflects the information on the invoices and packing lists provided by ECI to K+N Zaragoza.  Dkt. No. 27 ¶ 24; Mertsoy ¶ 22.  For example, the front side of sea waybill No. BANQZAZ0215306, issued on October 3, 2022, for the shipment of 10 pallets containing 200 cartons of electrical harnesses corresponding to invoice No. 94909608, provides, in relevant part:

| Place of Receipt (Multimodal Transport only) ZARAGOZA   DOOR | Pre-carriage by BY TRUCK | Port of Loading BARCELONA | Sea Waybill-No. BANQZAZ0215306 2212-0876-210.011 |
|---|---|---|---|
| Vessel CHICAGO EXPRESS | Voyage No. 0MRBNW1MA | Port of Transshipment | |
| Port of Discharge NEW YORK, NY | Place of Delivery (Multimodal Transport only) CHARLESTON, CFS | Movement CFS/CFS | Freight Payable at DESTINATION |

| PARTICULARS FURNISHED BY SHIPPER - CARRIER NOT RESPONSIBLE (See Clause 7.3) | | | | |
|---|---|---|---|---|
| Marks and Numbers | Number of Packages | Description of Goods | Gross Weight kgs | Measurement |
| MAHLE  CFS:CHARLESTON,SC | 200 | PACKAGE(S) ELECTRICAL MATERIAL 200 PACKAGES INTO 10 PALLETS  HS-CODE:8544429090 BANQZAZ0215306 | 1990.00 | 11.520 |
| TOTAL | 200 | FREIGHT COLLECT | 1990.00 | 11.520 |
| LOADED IN CONT. : 001 | | | | |

| OCEANFREIGHT AND CHARGES Rates, Weight and/or Measurement subject to correction | Prepaid | Collect | Declared Cargo Value ___ *** NO VALUE DECLARED *** If Merchant enters a value, Carrier's per package limitation of liability shall not apply and the ad valorem rate will be charged. |
|---|---|---|---|

SWB-1.

To generate the sea waybill, K+N or K+N Zaragoza inputs the information received from the shipper into SeaLog, the operating system for all K+N offices.  Tr. 62:24–63:9.  The keyboard operator will first enter the names of the shipper and consignee, the routing, the origin port, the destination port, and the vessel.  Tr. 64:20–65:4.  After doing so, the operator will be brought to a page to enter specifics of the shipment, including the pieces received and the

number of boxes, cases, crates, barrels, or drums being shipped.  Tr. 65:5–12, 68:22–69:4.[7]

Notably, the system does not allow the operator to simply enter the number of pallets because

regulations of the United States Customs and Border Patrol require the lowest externally visible

packaging unit to be reported on the manifest, and what is being reported for customs clearance

on the invoice must match what is on the manifest.  Tr. 65:5–17, 72:18–19, 77:17–23, 80:7–9,

85:14–86:4.[8]  A freeform text field then permits the operator to enter the marks and numbers and

the description of the goods being shipped.  Tr. 67:22–68:7.  The information in SeaLog is then

used to populate the sections on the front of sea waybill and is also transferred into K+N's

customs operating systems, Automated Manifest System ("AMS") and CargoWise, for customs

clearance purposes.  Prince ¶ 25–26; Mertsoy ¶ 14; Tr. 63:23–25.  The number of packages

column in the sea waybill is populated from the quantity entered into SeaLog in numeric form;

the description of goods comes from the information input by the operator on a free-form text

basis.  Tr. 68:8–15, 69:15–17.

     The SeaLog system is thus sensitive to U.S. customs requirements under 19 CFR § 4.7a.

Tr. 63:7–25; Prince ¶ 29.  U.S. Customs does not allow the quantity of pallets as the piece count

on the "Number of Packages" field, but instead requires the lowest visible quantity, which in this

---

[7] When a shipment is "CY/CY," meaning that the carrier is transporting a full container packed
by the shipper from one container yard to another, the number that the operator will enter in this
part of SeaLog will simply be "1," meaning one full container.  In that circumstance, "1" will
appear in the "Number of Packages" column, with a more detailed description appearing in the
"Description of Goods" field.  Tr. 83:8–84:11, 86:16–87:11.

[8] The applicable regulations require the Cargo Declaration to state: "The numbers and quantities
from the carrier's ocean bills of lading, either master or house, as applicable (this means that the
carrier must transmit the quantity of the lowest external packaging unit; containers and pallets
are not acceptable manifested quantities; for example, a container containing 10 pallets with 200
cartons should be manifested as 200 cartons)."  9 C.F.R. § 4.7a(c)(4)(v).

case were the cartons.  Tr. 65:5–17, 68:22–69:4.  The number of pallets can be entered

elsewhere, such as the "Description of Goods" column.  Tr. 69:15–17.

    The bottom part on the front of each sea waybill contains a section for the Merchant[9] to

declare a value for the cargo.  SWB-1.  The relevant section states, "If Merchant enters a value,

Carrier's per package limitation of liability shall not apply and the valorem rate will be charged."

*Id.*  It also contains a receipt, which reads in pertinent part:

> Received by the Carrier from the Shipper, as far as ascertained by reasonable
> means of checking, in apparent good order and condition unless otherwise herein
> stated, the total number or quantity of Containers or other packages or units
> indicated in the box entitled "Number of Packages" for carriage from the port of
> loading (or the place of receipt, if mentioned above) to the port of discharge (or
> the place of delivery, if mentioned above), such carriage being always subject to
> the terms, rights, defences, provisions, conditions, exceptions, limitations liberties
> hereof (INCLUDING ALL THOSE TERMS AND CONDITIONS ON THE
> REVERSE HEREOF NUMBERED 1-21 AND THOSE TERMS AND
> CONDITIONS CONTAINED IN THE CARRIER'S APPLICABLE TARRIFF)
> …

*Id.*

    The consignee, Mahle, never discussed with K+N what information K+N would include

in the sea waybills.  Chavez ¶ 17.  ECI was not involved with drafting the sea waybills for this

shipment and did not discuss what information to include in the "Number of Packages" or

"Description of Goods" columns in the sea waybills.  Ruiz Perez ¶ 9.  However, as the Carrier,

K+N was obligated by COGSA, as incorporated in the sea waybill, to provide "either the number

of packages or pieces, or the quantity or weight, as the case may be, as furnished in writing by

the shipper."  COGSA § 3(3)(b).

---

[9] Per the "Definitions" section of the sea waybill, a "Merchant" includes the shipper, consignee,
and notify party.  "Notify Party" is not defined.  SWB-1 § 1.

The reverse side of the sea waybill apparently is uniform for all shipments handled by K+N. It contains a standard set of Terms and Conditions ("T&Cs") numbered 1–21. *Id.* Section 1, the "DEFINITIONS" section, makes clear that the T&Cs were drafted to apply to U.S. and non-U.S. shipments. SWB-1.§ 1. It defines "US Carriage," as "carriage, to, from or through any port of the United States of America," and "Non-US Carriage" as "any carriage which is not US Carriage." *Id.* § 1. Section 2 of the T&Cs, "CONTRACTING PARTIES," plainly states that the sea waybill is a contract only between the Carrier (K+N) and the Shipper ("the Person who tendered the Goods to the Carrier," here, ECI). *Id.* § 2. It also requires the Shipper to provide the "Merchant and in particular the consignee "with a legible copy of all the Terms and Conditions contained in this sea waybill." *Id.* Section 3 of the T&Cs provides "[t]he provisions of the Carrier's applicable tariff … are incorporated herein." *Id.* § 3.

Section 6, "CARRIER'S LIABILITY," contains provisions which differ depending on whether the shipment involves U.S. Carriage or Non-U.S. Carriage. *Id.* § 6. For U.S. Carriage, the T&Cs incorporate COGSA and declares that "this sea waybill shall have effect subject to the provisions of COGSA and to the Pomerene Act regardless of whether said Act would apply of its own force." *Id.* § 6.[10] Section 6.1, addressed to shipments in "U.S. CARRIAGE," states:

> Neither the Carrier nor the Vessel shall in any event be or become liable in any amount exceeding US$500 per package or customary freight unit. For limitation purposes under COGSA, it is agreed that the meaning of the word "package" shall be any palletised and/or unitized assemblage of cartons which has been palletised and/or unitised for the convenience of the Merchant, regardless of whether said pallet or unit is disclosed on the front hereof.

---

[10] The Pomerene Act, also known as the Federal Bill of Lading Act, 49 U.S.C. §§ 80101 to 80116, "governs bills of lading issued in the United States or its territories in interstate or foreign commerce, and state law is superseded. Bills of lading issued outside the United States are governed by the general maritime law, considering relevant choice of law rules." 1 T. J. Schoenbaum, Admiralty & Maritime Law § 10:11 (6th ed. 2019). "The rules on the content of the bill of lading under COGSA § 3(3) are more exacting than the rules under the Pomerene Act." *Id*. at § 11:16.

*Id.*

Section 6.2, with respect to "NON-US CARRIAGE," provides, in part, "the liability of the Carrier for loss of or damage to the Goods shall be determined in accordance with any national law making the Hague Rules or Hague-Visby Rules compulsorily appliable to bills of lading and if no such national law is compulsorily applicable, then in accordance with the Hague-Visby Rules Article 1–8 inclusive (excluding Article 3 rule 8)." *Id.* § 6.2.[11]

The "DEFINITIONS" section of the T&Cs defines the Defendant K+N as the Carrier. *Id.* § 1.  It also contains a definition of "Package," which reads:

> "Package" where a Container is loaded with more than one package or unit, the packages or other shipping units enumerated on the face of this sea waybill as packed in such Container and entered in the box on the face hereof entitled "Total number of Containers or Packages received by the Carrier" are each deemed a Package.

*Id.*

The record is ambiguous as to how precisely the freight cost is calculated.  It was ECI's understanding, as K+N's counterpart, that K+N would be paid according to the number of pallets sent because that is "what we do with the carriers. We pay according to the number of pallets shipped."  Tr. 177:4–14.  However, K+N's Vice President, Trade Control–Import and Export,

---

[11] Article 5 of the Hague Rules, from which the limitation provision of COGSA is drawn, provides: "Neither the carrier nor the ship shall in any event be or become liable for any loss or damage to or in connexion with goods in an amount exceeding 100 pounds sterling per package or unit, or the equivalent of that sum in other currency unless the nature and value of such goods have been declared by the shipper before shipment and inserted in the bill of lading." International Convention for the Unification of Certain Rules of Law relating to Bills of Lading ("Hague Rules") art. 5, Aug. 25, 1924, 51 Stat. 233, 120 LNTS 155.  The Hague-Visby Rules amend the provision to read: "Unless the nature and value of such goods have been declared by the shipper before shipment and inserted in the bill of lading, neither the carrier nor the ship shall in any event be or become liable for any loss or damage to or in connection with the goods in an amount exceeding the equivalent of 666.67 units of account per package or unit or units of account per kilo or gross weight of the goods lost or damaged, whichever is the higher. Hague Rules, art. 5, Aug. 25, 1924, 120 L.N.T.S. 155, as amended by the Visby Protocol, Feb. 23, 1968, 1400 U.N.T.S. 47.

testified that the freight rate for "Less than Container Load" ("LCL") shipments was "based on cubic measure or the weight; it's whichever is greater." Tr. 70:12–19. Any difference between these two accounts is more apparent than real. Mahle routinely requested the shipment of pallets, and the dimension or weight of the pallets was included in the freight cost. Tr. 70:20–71:19. Thus, whether framed as payment according to dimension or weight of the shipment or dimension and weight of the pallet, the result is the same—Mahle paid according to the dimension or weight of the pallet it was being sent.

## CONCLUSIONS OF LAW

The sole issue for the Court is to determine the applicable limitation of liability. The sea waybills, by their terms, are subject to the provisions of COGSA and the Pomerene Act, regardless of whether those Acts would otherwise apply. SWB-1 § 6.1(a). Section 4(5) of COGSA limits the liability of a carrier for the loss or damage to or in connection with the transportation of goods to an amount not "exceeding $500 per package . . . , or in the case of goods not shipped in packages, per customary freight unit," unless the shipper declares a higher value. COGSA § 4(5).[12] Plaintiff argues that the operative package for purposes of the sea waybill is the carton into which the electric wire harnesses were packaged. A total of 480 cartons destined for Mahle were in the container that fell into the water. DX-1. On that basis, the limitation of liability would be $240,000 (480 x $500). Plaintiff claims actual damages of

---

[12] Section 4(5) provides: "Neither the carrier nor the ship shall in any event be or become liable for any loss or damage to or in connection with the transportation of goods in an amount exceeding $500 per package . . . , or in the case of goods not shipped in packages, per customary freight unit, . . . unless the nature and value of such goods have been declared by the shipper before shipment and inserted on the bill of lading  This declaration, if embodied in the bill of lading, shall be prima facie evidence, but shall not be conclusive on the carrier. By agreement between the carrier, master, or agent of the carrier, and the shipper another maximum amount than that mentioned in this paragraph may be fixed: *Provided*, That such maximum shall not be less than the figure above named. In no event shall the carrier be liable for more than the amount of damage actually sustained." COGSA § 4(5).

$119,967.99, well below the COGSA limit.  Dkt. No. 47 at 2.  Defendant, for its part, contends that the pallet is the relevant unit for limitation purposes under COGSA as incorporated by reference in the sea waybills.  Given there were 24 pallets in the container, Defendant contends its liability is limited to $12,000 (24 x $500).  *Id.*

The parties agree that federal maritime law applies when interpreting a sea waybill, which is a maritime contract.  The sea waybills at issue covered the ocean transportation of goods from Spain to the United States.  "When a contract is a maritime one, and the dispute is not inherently local, federal law controls the contract interpretation."  *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 22–23 (2004); *Herod's Stone Design v. Mediterranean Shipping Co. S.A.,* 846 Fed. Appx. 37, 40 (2d Cir. 2021) ("The Waybill is a maritime contract governed by federal maritime law, as its primary purpose was to transport goods by sea from China to California."); *Affiliated FM Ins. Co. v. Kuehne + Nagel, Inc.*, 328 F.Supp.3d 329, 334 (S.D.N.Y. 2018).  "Applying state law to cases like this one would undermine the uniformity of general maritime law."  *Norfolk S. Ry. Co.*, 543 U.S. at 28.  The parties chose to do business through a sea waybill rather than through a bill of lading, so COGSA does not apply *ex proprio vigore*.  However, "COGSA also gives the option of extending its rule by contract."  *Norfolk S. Ry. Co.*, 543 U.S. at 29.  "Where a statute is incorporated by reference its provisions are merely terms of the contract evidenced by the bill of lading."  *Pannell v. United States Lines Co.*, 263 F.2d 497, 498 (2d Cir. 1959); *cf. Smythgreyhound v. M/V Eurygenes*, 666 F.2d 746, 751 (2d Cir. 1981); *Commonwealth Petrochemicals Inc. v. S/S Puerto Rico*, 607 F.2d 322, 328 (4th Cir. 1979).

Under federal maritime law, "contracts for carriage of goods by sea must be construed like any other contracts: by their terms and consistent with the intent of the parties."  *Norfolk S. Ry. Co.*, 543 U.S. at 31.  "Where the words of a contract in writing are clear and unambiguous,

its meaning is to be ascertained in accordance with its plainly expressed intent. In such circumstances, the parties' intent can be determined from the face of the agreement and the language that they used to memorialize [that] agreement." *CITGO Asphalt Ref. Co. v. Frescati Shipping Co., Ltd.*, 589 U.S. 348, 355 (2020) (internal citations and quotations omitted); *see also Electra v. 59 Murray Enterprises, Inc.* 987 F.3d 233, 244–245 (2d Cir. 2021); 1 Williston on Contracts § 30:6 (4th ed. 2024). Where possible, the court must interpret a contract to avoid surplusage and give meaning to each contractual provision. *See Garza v. Marine Transp. Lines, Inc.*, 861 F.2d 23, 27 (2d Cir. 1988); *Pannell*, 263 F.2d at 498; *see also Hercules OEM*, 2023 WL 6317950, at *10 ("[A]n interpretation that gives reasonable and effective meaning to all terms of a contract is preferable to one that leaves a portion of the writing useless or inexplicable.") (internal citations omitted); *see also Certified Multi-Media Sols, Ltd. v. Preferred Contractors Insurance Company Risk Retention Grp., LLC*, 674 Fed. App'x 45, 47 (2d Cir. 2017) (general rules of contract interpretation require construing contract to give full meaning and effect to all provisions and avoid interpretations that render clauses superfluous or meaningless). The court must also avoid an interpretation that "sets up two clauses in conflict with one another." *CITGO Asphalt Ref. Co.*, 589 U.S. at 362 (cleaned up); *Mastrobuono v. Shearson Lehman Hutton, Inc*, 514 U.S. 52, 63–64 (1995); *see also* 1 Williston on Contracts § 32:9. "A word or phrase is ambiguous when it is capable of more than a single meaning 'when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'" *Garza*, 861 F.2d at 27 (quoting *Walk–In Medical Centers, Inc. v. Breauer Capital Corp.*, 818 F.2d 260, 263 (2d Cir. 1987)); *Eskimo Pie Corp. v. Whitelawn Dairies, Inc.*, 284 F. Supp. 987, 994 (S.D.N.Y. 1968).

The Court concludes that the sea waybills are clear and unambiguous.  Where, as here, the contract is one for U.S. carriage, Defendant's liability is limited by this contract to $500 per pallet where the cargo has been palletised or utilized for the convenience of the merchant.  The Cargo here was palletised by ECI for the benefit of Mahle.  Defendant's liability is therefore limited to $500 per pallet.

The Court starts, as it must, with the language of the sea waybill.  *Binladen BSB Landscaping v. M.V. Nedlloyd Lines*, 759 F.2d 1006, 1012 (2d Cir. 1985) ("[T]he touchstone of our analysis should be the contractual agreement between the parties, as set forth in the bill of lading."); *A.P. Moller-Maersk A/S v. Ocean Express Miami*, 590 F.Supp.2d 526, 532 (S.D.N.Y. 2008) ("First resort in interpreting the term ['package'] must be to the parties' contract, as set forth in the bill of lading.").  Directed to U.S. Carriage, Section 6.1(c) provides:

> Neither the Carrier nor the Vessel shall in any event be or become liable in an amount exceeding US$500 per package or customary freight unit.  For limitation purposes under COGSA, it is agreed that the meaning of the word 'package' shall be any palletised and/or unitized assemblage of cartons which has been palletised and/or unitised for the convenience of the Merchant, regardless of whether said pallet or unit is disclosed on the front hereof.

SWB-1 § 6.1(c).

Each of those words is susceptible of only one meaning.  Where the contract of carriage is one to, from, or through any port of the United States of America, the carrier's liability is limited to $500 per package.  *Id.*  Where an assemblage of cartons has been palletised or unitised for the convenience of the "Merchant," defined in the sea waybills as "the Shipper and the Persons named in this sea waybill as consignee and notify party," SWB-1 § 1, the "package" for limitation of liability purposes is the pallet.  That provision applies "regardless of whether said pallet or unit is disclosed on the front hereof."  It thus is irrelevant whether the number of packages on the front of the sea waybill is calculated

on the basis of a pallet, a carton, or some smaller unit.  Regardless of what is stated on the front of the sea waybill, if the contract of carriage is one for U.S. Carriage, then under this contract, the package for limitation of liability purposes is the pallet.

Plaintiff relies on the definition of "Package" under the definitions section of the T&Cs of the sea waybill, SWB-1 § 1, the front of the sea waybill which describes "Packages" or cartons as the unit of measurement under the column "Number of Packages," and the Second Circuit's decision in *Seguros Illimani S.A. v. M/V Popi P*, 929 F.2d 89, 93 (2d Cir. 1991).  In the definitions section of the sea waybill, "Package" is defined as "the packages or other shipping units enumerated on the face of this sea waybill as packaged in such Container and entered in the box on the face hereof entitled 'Total number of Containers or Packages received by the Carrier.'"  SWB-1 § 1.  In this case, the units under the column "Number of Packages" on the sea waybills correspond to the number of cartons K+N agreed to carry.  Plaintiff thus argues that "package" for limitation of liability purposes should be the number of cartons.  Plaintiff seeks to gain support for its argument from the Second Circuit's statement in *Seguros* that "[t]he number appearing under the heading 'NO. OF PKGS.' is our starting point for determining the number of packages for purposes of the COGSA per-package limitation, and unless the significance of that number is plainly contradicted by contrary evidence of the parties' intent, or unless the number refers to items that cannot qualify as 'packages,' it is also the ending point of our inquiry."  929 F.2d at 94.

The Court was prepared to accept at the summary judgment stage that it was possible that Section 1's definition of package on the back of the sea waybill combined with the column under "Number of Packages" was in conflict with the more specific

language of Section 6.1(c).  At that stage, defendant had "not offered a satisfactory understanding that would render the Number of Packages heading anything other than surplusage if its reading of the T&Cs were adopted."  Dkt. No. 37 at 6.  If the only purpose of the "Number of Packages" column was to specify the carrier's limitation of liability then, at least in theory, there would be tension between the front of the sea waybill and the back.  With the benefit of further close reflection, the potential conflict is more apparent than real.  The definitional language of Section 1 and the column for "Number of Packages" has a purpose different from the section that sets out the limitation of liability and can be readily reconciled with the language of Section 6.1(c) in a way that gives meaning to all contractual provisions.

The sea waybill is a standard form contract intended for a wide variety of circumstances.  From its face, it is apparent that it applies to the U.S. and non-U.S. carriage of loose cargo and packages as well as to pallets and containers.  Standard form contracts are essential to the modern economy, permitting parties to agree to a single set of terms designed to apply to a variety of different circumstances.  Restatement (Second) of Contracts § 211, cmt. a (Am. L. Inst. 1981); *see also* 1 Corbin on Contracts § 1.4 (2024).  Each term in the standard contract will be relevant to one or the other of the types of transactions to be governed by the contract even if that term is not necessarily relevant to every type of transaction.  That is the point of a standard form contract—it is adaptable.  *Id.*  Judge Learned Hand long ago described bills of lading as "a motley patchwork of verbiage thrown together apparently at random, often in an unfamiliar diction three hundred years old."  *Farr v. Hain S. S. Co.*, 121 F.2d 940, 945 (2d Cir. 1941).  He added that with such contracts, it was "idle to invoke the canon against

redundancy."  *Id*.  While any particular provision might appear meaningless as applied to the narrow circumstances of a specific shipment, it would have meaning when the aperture was expanded, and the full range of circumstances the standard form contract was intended to address was considered.  "Particularly in a document meant to do service in varying situations each word of such a discordant medley need not be made to count as we seek to make all the words count of carefully prepared contracts drawn for a particular occasion."  *Id*.; *see also Commonwealth Petrochemicals*, 607 F.2d at 328; *Continental U.K. Ltd. v. Anagel Confidence Compania Naviera, S.A.*, 658 F.Supp. 809, 813 (S.D.N.Y. 1987).

The Court need not construe the definition of "Package" in Section 1 to apply to the limitation of liability for U.S. carriage to give it meaning.  For one, Section 6.1(c), which limits the carrier's liability to the pallet, is narrowly cabined.  It applies only to U.S. carriage and only where the pallet was assembled "for the convenience of the Merchant."  SWB-1 § 6.1(c).  Where the carrier is given loose cartons or where it palletises the cartons for its own benefit, and not the merchant's, Section 6.1(c) does not apply.  In that circumstance, the parties would default to the definition of the term "Package" and the figure under the column heading "Number of Packages" would have force.  In the absence of any other definition of "Package," the form of package reflected in the column "Number of Packages" would control for COGSA purposes.[13]

_____

[13] In addition, Section 6.1(c) only applies to U.S. carriage.  By implication, to the extent that the Hague rules and the Hague-Vigsby rules make the limitation of liability for non-US Carriage turn upon the package, Section 6.1(c) would not be controlling while the definition under Section 1 would be controlling.

Moreover, the "Number of Packages" column has the most direct meaning with respect to the receipt contained in the sea waybill.  In signing the sea waybill, the carrier agrees that it has received from the shipper "in apparent good order and condition unless otherwise herein stated, the total number or quantity of Containers or other packages or units indicated in the box entitled 'Number of Packages' for carriage from the port of loading . . . to the port of discharge."  SWB-1.  The receipt is *prima facie* evidence that the carrier has received that number of packages and that the packages are "in apparent good order and condition."  *Leather's Best Intern., Inc. v. MV Lloyd Sergipe*, 760 F. Supp. 301, 308–09 (S.D.N.Y. 1991); *Van Ekris & Stoett, Inc. v. S.S. Rio Paraguay*, 573 F. Supp. 1475, 1478 (S.D.N.Y. 1983).  If, upon discharge, the carrier does not have the number of packages reflected in the "Number of Packages" column or if those packages are not in good order and condition, the burden will be on the carrier to show that it received fewer packages than represented.  *Leather's Best Intern*, 760 F.Supp. at 309–10.  Thus, leaving aside the separate question of the relevance of the "Number of Packages" column for the purposes of *limitation* of liability, that column has a significant purpose for initial liability determinations.  It is a tool that measures the potential liability against which the cap for limitation of liability will be applied.  If, for example, the "Number of Packages" column lists 40 cartons worth $200 each and upon discharge, the carrier is found to have only 39 cartons, it will be irrelevant that the carrier's liability is limited to $500 per pallet.  The carrier's liability will be $200; all of the work being done by the "Number of Packages" column and the receiving employee's inspection upon discharge.

Furthermore, the term "Package," with a capital "P" is used only once elsewhere in the T&Cs. Section 6.3(b), which applies to both U.S. carriage and non-US carriage, provides in relevant part:

> Ad Valorem: declared value of Package or shipping unit. The Carrier's liability may be increased to a higher value by a declaration in writing of the value of the Goods by the Merchant upon delivery to the Carrier of the Goods for shipment, such higher value being inserted on the front of this sea waybill in the space provided and, if required by the carrier, extra freight being paid.

SWB-1 § 6.3(b). ECI did not declare a value for its Cargo, leaving the "Declared Cargo Value" section blank on the sea waybills at issue. SWB-1. But that does not render the definition of "Package" meaningless. Had ECI declared a value, that value would have been measured on a per-"Package" basis, with package taking on the meaning set forth in the definitions section of the T&Cs.

Plaintiff's other arguments are not convincing. Plaintiff relies on the Second Circuit's decision in *Seguros*, 929 F.2d at 93, but that decision cannot support the weight Plaintiff puts on it. The question in *Seguros* was, in a contract for U.S. carriage pursuant to a bill of lading, whether the steel-strapped bundle of 15 ingots or each individual ingot constituted the appropriate COGSA package. The bill of lading presented an apparent conflict between the information in the "Number of Packages" column and the "Description of Packages and Goods" column. The relevant bill of lading listed the number 600 under the column "NO. OF PKGS," corresponding to the number of ingots, and under the column "Description of Packages and Goods" contained the description "ingots: tin ingots," but it also contained "a separate line or two describing, among other things," the number of bundles which indicated 40 bundles. *Id.* at 94. The court concluded that the figure under "NO.OF PKGS" reflected the parties' understanding "if the numbers referred could fairly be considered a 'package.'" *Id.* at 95. However,

24

because the ingots were not themselves packages, the court then turned to "the next best indication of the parties' intent, the numbers reflected on the bills of lading that do refer to something that qualifies as a 'package,'" *i.e.*, the number of bundles. *Id.*

The court in *Seguros* did not depart from contract interpretation principles generally applicable to maritime contracts, but in fact applied them. It stated: "A resolution of the shippers' claim presents primarily the question of whether the bill of lading, construed as a contract, reveals the parties' agreement on the appropriate COGSA 'package.'" *Id.* at 94. Plaintiff relies on language from *Seguros* in which the court stated that "[t]he number appearing under the heading 'NO. OF PKGS.'" was the Court's "starting point for determining the number of packages for purposes of the COGSA per-package limitation." *Id.* at 94. But Plaintiff ignores that the court then made clear that the figure under that column provided only the "starting point" for analysis and not the ending point. The court specifically envisioned the circumstance, under COGSA, where the number under the "Number of Packages" column might reflect one form of package and language elsewhere in the bill of lading would reflect a different form of package. *Id.* It held that, in such circumstance, the parties would not be bound to the unit under "Number of Packages" if either (1) "the significance of that number [wa]s plainly contradicted by contrary evidence of the parties' intent," or (2) "the number refer[red] to items that cannot qualify as 'packages.'" *Id.* In this case, for reasons already stated, the figure under the column heading "Number of Packages" is plainly contradicted by contrary evidence of the parties' intent.[14]

---

[14] The Court need not address the Defendant's argument in the alternative that, regardless of whether the pallets could qualify as COGSA packages, they are the appropriate unit of measurement for liability purposes when COGSA does not apply *ex proprio vigore.*

Plaintiff also relies on language from *Mitsui & Co. v. America Export Lines, Inc.*, 636 F.2d 807, 822–23 (2d Cir. 1981), quoted in *Monica Textile Corp. v. S.S. Tana*, 952 F.2d 636 (2d Cir. 1991), to argue that "bills of lading are contracts of adhesion ambiguities in which must be resolved against the carrier," *Monica Textile*, 952 F.2d at 643 (quoting *Mitsui*, 636 F.2d at 822–23). There are several rejoinders to that point. First, COGSA applied *ex proprio vigore* in both *Mitsui* and *Monica Textile*. The task in those cases involved statutory interpretation—how to "interpre[t] section 4(5) of COGSA to give effect to the congressional purpose of establishing a reasonable minimum level of liability." *Smythgreyhound*, 666 F.2d at 750. Courts look askance at definitions of "package" in bills of lading that are "repugnant" to COGSA. *Standard Electrica*, 375 F.2d at 946. By contrast, COGSA does not apply *ex proprio vigore* in this case. The sole job of the Court is to interpret the sea waybill according to maritime principles of contract interpretation. *Smythgreyhound*, 666 F.2d at 751.

Moreover, neither *Mitsui* nor *Monica Textile* turned on concerns "with the actual or potential inequality of power between shippers and carriers." *Id.* at 750. *Mitsui* held that, in light of congressional intent under COGSA, courts must "take a critical look" at clauses purporting to define the container as the COGSA package. *Mitsui*, 636 F.2d at 815. *Monica Textile* raised the question of whether the *Seguros* principle requiring deference to the parties' intent as reflected in the bill of lading implicitly overruled *Mitsui*. The court held that it did not. Container and non-container cases are not "interchangeable; they were then and remain now separate lines of authority." *Monica Textile*, 952 F.2d at 640. "In non-container cases we have generally deferred to the parties' intent, as manifested by their bill of lading, in determining what unit is the

relevant COGSA package." *Id.* at 641.  Thus, the principles of *Mitsui* and *Monica Textile* are, by their terms, limited to container cases.[15]

This case involves pallets, not containers.  The shipper, not the carrier, prepared the pallets for the convenience of the shipper and the consignee.  The carrier would have been paid a freight rate that included the weight or volume of the pallets.  Even if sea waybills are considered contracts of adhesion, the applicable principle of construction only requires that the contract be interpreted against the drafter, K+N, as a last resort.  11 Williston on Contracts § 32:12 (4th ed. 2024).  Here, because the language is clear and unambiguous, there is no basis to construe the contract against K+N.

The little parol evidence that was adduced, if it is considered, also favors Defendant.  The one consistent measurement common to all of the shipping documents between ECI and Mahle is the number of pallets.  The number of pallets appears on the invoice, on the packing list, and the sea waybill.  By contrast, the number of cartons is not on the invoice.  That is because the number of pallets is significant for ECI, Mahle, and K+N.  Mahle orders these products to be packed on pallets by ECI.  The pallet is the convenient packaging unit for ECI and Mahle.  DX-4; Tr. 9:9–15.  It is safer, and more efficient, for Mahle to receive product by pallet than by loose carton.  Tr. 16:25–18:9.  It is also more efficient for ECI to ship the product by pallet.  Tr. 159:11–13.  The carrier is paid based on the volume or weight of the shipment, including the volume or weight of the pallets.  Tr. 70:12–19; 177:4–14.  Whether the pallets contain 20 cartons

---

[15] In *Mitsui*, Judge Friendly observed that unlike pallets, which are provided by the shipper, "containers are typically supplied by the carrier, must be returned to the carrier by the consignee, and are used and reused hundreds of times," "[t]he shipper normally pays for the weight of the pallet but not for that of the container," and the container is "'functionally a part of the ship.'" *Mitsui & Co. v. Am. Exp. Lines, Inc.*, 636 F.2d 807, 816 (2d Cir. 1981) (quoting *Leather's Best, Inc. v. S.S. Mormaclynx*, 451 F.2d 800, 815 (2d Cir. 1971)).

or 40 cartons, the carrier is indifferent—it is obligated to pick up a pallet, to load the pallet onto a container, to unload the pallet from the container, and to deliver the pallet. As directed by ECI and Mahle, the pallet is the unit of shipment for the carrier.

It makes sense from that course of business that the parties would intend that the pallet—rather than the carton—would be the unit to which the COGSA limitation of liability is applied. *Crescent Oil and Shipping Services, Ltd. v. Phibro Energy, Inc.*, 929 F.2d 49, 52 (2d Cir. 1991) (finding that evidence of the course of dealing and performance and usage of trade may be employed to explain or supplement, but not to vary from or contradict, provisions of a contract). COGSA liability, and the COGSA limitation of liability, is a form of allocating risks between the parties. It is a form of quasi-insurance. The greater the liability to which the carrier will be exposed, all else being equal, the more it will charge for carriage. *See Norfolk S. Ry. Co.*, 543 U.S. at 19. From that perspective, it is logical that the parties would agree that COGSA liability, and the limitation of liability, were based on the pallet. It makes far less sense for COGSA liability, and the limitation of liability, to turn upon a unit—the carton—which from the evidence before the parties is insignificant as to logistics or cost of the shipping transaction.

Finally, Plaintiff's argument, if taken to its logical conclusion, would lead to absurd consequences. In Plaintiff's view, the COGSA package to which the $500 limitation of liability applies will always be the container reflected in the "Number of Packages" column, no matter how small that container is and how little relation it bears to the value of the product being shipped. But Plaintiff also admits—as the practice of the parties and the front of the sea waybill reflects—that the unit from which the number of packages is calculated is within the unilateral control of the shipper. However the shipper calculates the "Number of Packages" is what will be

on the front of the sea waybill.  Those are "particulars furnished by shipper."  SWB-1.[16]  Thus,

under Plaintiff's theory, a shoebox conceivably could be the COGSA container.  If, after the

tariff was negotiated, the shipper asked that the units under "Number of Packages" be based on

the number of shoeboxes, the carrier would have to comply.  But that demonstrates the fallacy of

the Plaintiff's position here.  While it seeks to cloak itself as the victim of an unequal bargaining

situation and have the Court disregard the language of the sea waybill on the basis of that

presumed unequal bargaining situation, the rule for which it advocates would give the shipper

the unilateral ability to set the terms of COGSA liability (and limitation of liability) without

regard to the parties' intent.  Were that rule adopted, the measure of the COGSA package, even

in a case where COGSA did not apply *ex proprio vigore*, would no longer be what the parties

intended based upon the contract form they chose to do business.  *Allied Intern. American Eagle

Trading Corp. v. S. S. Yang Ming,* 672 F.2d 1055, 1061 (2d Cir. 1982) (holding that courts have

no choice but to follow the parties' express or implied understanding of a bill of lading).  Instead,

it would be whatever the shipper (or the shipper acting at the behest of the consignee) said what

the package was.  The carrier would be at the mercy of the shipper.  As this very case illustrates,

it could render the COGSA limitation of liability illusory—the shipper could simply set the

COGSA limitation at whatever amount it sought by the mere expedient of choosing a container

---

[16] COGSA also provides that any bill of lading must show "[e]ither the number of packages or pieces, or the quantity or weight, as the case may be, as furnished in writing by the shipper." COGSA § 3(3)(b); *Spanish-American Skin Co. v. the M. S. Ferngulf*, 143 F.Supp. 345, 349 (S.D.N.Y. 1956); *cf. BinLaden*, 759 F.2d at 1016 ("The ability of the shipper and carrier to contract fairly for the division of liability between themselves depends in turn on disclosure of the relevant information about the packaging of the goods being shipped. The shipper retains the power to protect itself by stating in plain terms on the bill of lading the number of COGSA packages being shipped.").

that is small enough that the limitation would be irrelevant.[17]  If a shipper desires to obtain insurance from a carrier in excess of the limit provided by COGSA, it has a ready means of doing so.  COGSA provides that the shipper and carrier can agree to an ad valorem dollar amount provided that such amount shall not be less than $500 per package.  COGSA § 4(5).  However, as the terms and conditions of the sea waybill themselves reflect, that mechanism is not necessarily cost-free.  The carrier who is asked to assume additional responsibility for a shipment has the right to charge additional sums in exchange for assuming that responsibility.  SWB-1 § 6.3.  If ECI or Mahle wished to define "Package" differently, it could have negotiated with the carrier.  *Yang Ming*, 672 F.2d at 1064.  They did not do so here.  Plaintiff, as Mahle's subrogee, is not entitled to receive the same result, without paying, by interpreting the sea waybill in a manner that deprives Section 6.1(c) of any meaning.[18]

## CONCLUSION

For the foregoing reasons, the Court finds that, under the terms of the applicable sea waybill and the incorporated provisions of COGSA, the proper unit for limitation of liability in this case is the pallet.  The evidence demonstrates that the electrical wire harnesses were palletised for the convenience of the shipper and consignee, and that the sea waybill's limitation

---

[17] The four sea waybills account for a total of 480 cartons.  DX-2 at K+N000040, 57, 62; DX-3 at PLF000157.  Rendering each carton a Package would bring Defendant's total liability to $240,000 (500 x 480).  In this case, Plaintiff is demanding $119,967.99 in actual damages.  Dkt. No. 47 at 2.

[18] In reaching this conclusion, the Court does not rely on the evidence offered by Defendant that the figure in the Number of Packages column is intended for customs purposes and not for COGSA purposes.  *See, e.g.*, Prince ¶ 28.  That evidence was subject to challenge and, at most, establishes the unilateral understanding of Defendant.  Tr. 214:19–215:5.  There is no evidence that such understanding was shared with ECI or with Mahle.  Accordingly, it is not independently probative of a meeting of the minds by the parties.  *Cf. Invista B.V. v. E.I. du Pont de Nemours & Co.*, 2008 WL 4865044, at *5 (S.D.N.Y. Nov. 5, 2008) (holding that a unilateral expression of one party's post-contractual subjective understanding of the terms of a contract is not probative for its interpretation).

of liability provision unambiguously applies to such palletised shipments.  Accordingly, Defendant's liability is limited to $500 per pallet, resulting in a total liability cap of $12,000.

      For these reasons, judgment is entered in favor of Plaintiff in the amount of $12,000, in accordance with the contractual limitation of liability and the stipulation of the parties as to liability.


      SO ORDERED.

Dated: February 10, 2025
      New York, New York

                      LEWIS J. LIMAN
               United States District Judge